**In re GERI ZAHN, INC. d/b/a Just Clothes, Debtor.**

**Gui L.P. GOVAERT, Trustee in Bankruptcy of Geri Zahn, Inc., Plaintiff,**

**v.**

**FIRST AMERICAN BANK AND TRUST, a Florida Banking Corporation, Defendant.**

**Bankruptcy No. 87–04586–BKC–AJC. Adv. No. 89–0050–BKC–AJC–A.**

United States Bankruptcy Court, S.D. Florida.

July 13, 1989.

Stuart I. Levin, Miami, Fla., for trustee/plaintiff.

Jack Kolinski, Shutts & Bowen, Miami, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. JAY CRISTOL, Bankruptcy Judge.

This cause came on before the Court on May 17, 1989, upon the complaint of Gui L.P. Govaert, Trustee, for damages for Wrongful Dishonor, pursuant to F.S. 674.-402, Interference with Advantageous Business Relationship, and Common Law Fraud. The Court having heard the testimony, examined the evidence presented, observed the candor and demeanor of the witnesses, considered the argument of counsel, and being otherwise fully advised in the premises, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. During the months of June, July, August, September and October, 1985, George Jordan, chief loan officer of the Southern Division of First American Bank, and Thomas Abrams, Manager of First American Bank and Trust's Bay Harbor Island branch bank and a Vice–President of said Bank, conducted a sales campaign directed at Plaintiff's debtor to persuade its principals, Geri Zahn and Jason Zahn, to transfer all of their banking business from Barnett Bank to Defendant Bank.

2. In the course of the abovementioned meetings, Jason Zahn, President of Plaintiff's debtor, told Abrams what the debtor's requirements for financing were and what arrangements he had with Barnett Bank where the debtor was then doing its banking. Jason Zahn gave financial infor-mation from Barnett Bank to Defendant, First American, for its review.

3. The financial information from Barnett Bank and the discussions between Jason Zahn and Abrams, established that the Debtor had a loan from Barnett Bank consisting of a $100,000.00 note and a $50,-000.00 revolving line of credit (hereinafter the Barnett loan). Said loan was amortized at two points over the Prime rate. Further, the financial information and discussions established that the Debtor had only a $25,000.00 Certificate of Deposit as collateral with Barnett Bank, and no other substantial liquid assets were available as collateral to secure the Barnett loan.

4. George Jordan was aware of the terms and conditions of the Barnett Bank loan to the Debtor.

5. First American represented to the Debtor that because it wanted the Debtor's banking business, the Defendant, First American would offer the Debtor better terms than the Debtor was then receiving from Barnett Bank.

6. The loan committee of Defendant, First American, met on October 10, 1985 and October 24, 1985 to consider a loan to the Debtor.

7. Subsequent to both loan committee meetings with regard to the subject loan, Jordan discussed the actions of the loan committee with Abrams. Jordan had no direct communication with the Zahns after the loan committee meetings of October 10, 1985, and October 24, 1985.

8. On October 29, 1985, after the loan committee meeting on October 24, 1985, Abrams sent Jason Zahn and Geri Zahn a letter which spelled out the terms of the banking relationship that had been orally agreed upon between First American and the Debtor (hereinafter referred to as Banking Agreement). Said letter stated that the amount of the loan was $150,-000.00. Said letter further stated that $100,000.00 was to be applied as a capital loan to repay Barnett Bank for a loan in the corresponding amount, and further that $50,000.00 was to be used as a revolving line of credit and deposited in Defendant's bank in an interest bearing account. The

October 29, 1985 letter indicated that the $150,000.00 loan was to earn interest at 1½% over the prime lending rate, that the capital loan, $100,000 was to have a five year, and that the revolving line of credit was to be repaid on an ongoing basis from receipts of the debtor's business. In addition, the abovementioned letter stated that the $25,000.00 Certificate of Deposit then held by Barnett Bank would have to be assigned from Barnett Bank to the Defendant, First American, as further collateral. Furthermore, the letter stated that the Debtor was to place its business checking account with the Defendant, First American, assign key man life insurance, inventory, and receivables to the Defendant. Said letter also stated that the Debtor's principals were to place their personal accounts with the Defendant Bank.

9. The October 29, 1985 letter from Defendant, First American, to Jason Zahn and Geri Zahn did not state that Defendant, First American, could not meet the abovementioned terms and conditions.

10. On November 26, 1985, Abrams and George Jordan, the chief loan officer of the Southern Division of the Defendant, First American, went to the Debtor's place of business to execute documents prepared by the Defendant for the purpose of formally memorializing the loan previously agreed to by the parties.

11. Jordan presented Jason Zahn and Geri Zahn with a group of documents for them to sign in order to put the agreed loan into effect: a loan document and promissory note, a personal guaranty, a UCC financing statement, an assignment of lease, and a security agreement. Both Mr. Abrams and Mr. Jordan referred to the signing on November 26, 1985 as a "closing." Neither the Debtor nor the Debtor's principals received copies of said loan documents at this time although said copies were requested.

12. It is conceded that the Defendant did not sign any of these instruments at said time and place, but rather Mr. Jordan testified that he affixed his signature on these loan documents forty-four days later on January 8, 1986, in his Coral Gables office.

13. Defendant, First American admits that the Debtor's principals, Jason Zahn and Geri Zahn, relying upon both oral and written representations by representatives of First American relating to the loan conditions, and believing that the original Loan Documents presented to them on November 26, 1985, were consistent with the terms of the October 29, 1985 letter from Defendant, First American, executed the abovementioned documents.

14. In accordance with the Banking Agreement letter of October 29, 1985, the Defendant, First American funded $100,-000.00 of the $150,000.00 loan on December 19, 1985, which was used to repay the capital loan at Barnett Bank in full.

15. The Debtor's principals went to New York on a buying trip in December 3, 1985 to make use of the new revolving credit in the amount of $50,000.00. This buying trip was essential to the Debtor's ability to obtain merchandise necessary for the upcoming sales season. Said merchandise was paid for with checks drawn on the Debtor's account in Defendant Bank.

16. Defendant, First American, was aware of the Debtor's immediate need of the revolving line of credit for the buying trip. Said revolving line of credit, which the Debtor had with Barnett Bank, and which Debtor was assured by Defendant, First American, was necessary to sustain the viability and purchasing power of its business.

17. First American did not honor the Debtor's checks used to purchase merchandise on the New York trip. Furthermore, many of said dishonored checks were returned by the Defendant, First American, marked "insufficient funds." The Debtor's account was charged $15.00 for each check returned, for a total of $2,800.00 in such fees.

18. Jason Zahn, the Debtor's President, first learned of the returned checks in late December, 1985. Zahn called Abrams at Defendant, First American, who assured him that all checks would be paid.

19. On January 8, 1986, First American credited the account of the Plaintiff's Debtor in the amount of $49,703.50, representing the balance of the subject $150,000.00 loan less State of Florida documentary stamps.

20. Several of the Debtor's "prime" vendors who previously received checks from the Debtor which were dishonored by the Defendant, First American, for insufficient funds, refused to sell to the Debtor merchandise on terms which would allow the Debtor to stay in business.

21. The resulting loss of business caused the filing of an involuntary bankruptcy against the Debtor by its merchandise creditors.

22. In the summer of 1986, the Debtor finally received copies of the purported original loan documents executed on November 26, 1985. Said copies included the Note, UCC Filing Statement, the Security Agreement, the Guaranty, the Assignment of Lease, the Consent to the Assignment of Lease and the Landlord's Waiver. Although some of these documents such as the Assignment of Lease, Consent to the Assignment of Lease, Assignment of Life Insurance Policy, and Landlord's Waiver are dated, Jason Zahn, President of the Debtor company, discovered that all the other documents, including the Note, were dated January 8, 1986 by the Defendant, First American. January 8, 1986 was not the date on which the Debtor executed these documents. January 8, 1986, was twenty days subsequent to the funding of $100,000.00 of the total loan.

23. Mr. Jordan testified that it would not be unusual bank practice of Defendant, First American, to have borrowers sign undated notes. Jordan further testified that upon execution of all the necessary documents, that the $150,000.00 loan would be funded immediately.

24. Jason Zahn testified that in addition to the added execution dates, said copy of the purported Note, did not correctly reflect the terms previously agreed upon in the Banking Agreement by the Debtor and First American. Among the altered terms were:

(a) a floor was placed on the interest rate at 11%;

(b) the term of the loan was one year instead of five years; and

(c) there was an additional collateral listed for the loan.

25. Mr. Zahn further testified that had these additional security items and loan terms been included in the original loan documents, he would not have signed the subject note.

26. As a result of First American's banking practices, Mr. Zahn testified as to the Debtors damages:

| | | |
|---|---|---|
| (a) | investment | $100,000.00 |
| (b) | retained earnings | $ 72,000.00 |
| (c) | loans to the business | $ 32,000.00 |
| (d) | Certificate of Deposit | $ 25,000.00 |
| (e) | Prime Resource Profits | $100,000.00 |
| (f) | Insurance Policy ($100,000.00 Cash value) | $100,000.00 |

## CONCLUSIONS OF LAW

1. A Fraud may consist of a knowing or a reckless misrepresentation. *Guerra v. Fischer In and For Broward County*, 463 So.2d 535 (4th DCA 1985); *First National Bank of Stuart v. Jackson*, 267 So.2d 697 (4th DCA 1972).

2. For a misrepresentation to support an action for damages, it must be a misrepresentation of material fact. *Guerra*, supra; *Finney v. Frost*, 228 So.2d 617 (Fla.App.1969).

3. The individual charged with the misrepresentation must be shown to have had actual knowledge of the falsity of the statement at the time it was made or the evidence must show the equivalent of such knowledge as to its truth or falsity or was made under circumstances in which the truth should have been known to the person making the statement. *Guerra*, supra; *Nantell v. Lim–Wick Construction Co.*, 228 So.2d 634 (Fla.1969); *Joiner v. McCullers*, 158 Fla. 562, 28 So.2d 823 (Fla.1947).

4. Additionally, in order to prevail on a theory of fraud, the party asserting fraud must prove that the misrepresentation was intended to and does induce another to act to his detriment in reliance on the

representation. *In re Matter of Interair Services, Inc.*, 44 B.R. 899 (Bankr.M.D.Fla. 1984); *Rudy's Glass Construction Co. v. Robins*, 427 So.2d 1051 (3rd DCA 1983).

5. Defendant, First American, misrepresented material facts to the Debtor. *Guerra*, supra; *Finney*, supra. Defendant misrepresented the terms and conditions of the loan and promissory note including the interest rate floor of 11%, the term of the loan and the additional required collateral.

6. Defendant contends that the loan documents placed in evidence properly reflect the loan committee's decision and requirements regarding the subject loan. However, the original oral Banking Agreement as spelled out in the letter dated October 29, 1985, reflects a totally different outcome by the loan committee. This letter, sent to Jason Zahn and Geri Zahn is a knowing and reckless misrepresentation. *Guerra*, supra; *Jackson*, supra.

7. Mr. Jordan specifically told Mr. Abrams about the loan committee meeting wherein the Debtor's loan was discussed. Yet Mr. Abrams communicated different terms and conditions to the Debtor. Assuming Mr. Jordan is "of clean hands" and properly communicated the committee meeting to Mr. Abrams, Mr. Abrams had actual knowledge of the falsity of the statements made to the Debtor's principals in his letter dated October 29, 1985. *Guerra*, supra.

8. Additionally, if Mr. Jordan had not properly communicated the decision of the loan committee meeting to Mr. Abrams, then the Defendant recklessly misrepresented material facts to the Debtor under circumstances in which the truth should have been known to the Defendant. *Guerra*, supra; *Nantell*, supra; *Joiner*, supra.

9. The misrepresentation by the Defendant, as described above, induced the Debtor to execute loan documents on November 26, 1985. *In re Interair Services, Inc.*, supra. *Robins*, supra. The loan agreement and promissory note, on November 26, 1985, were lacking material terms, the interest rate floor, the term of the loan, and the additional collateral. The Debtor detrimentally relied on the Defendant,

First American's material misrepresentations in the letter of October 29, 1984 and therefore executed the loan documents believing that the missing terms and conditions were consistent with said letter.

10. Further, in reliance on the Defendant's misrepresentations as described above, the Debtor purchased merchandise in New York on December 1985 with checks drawn on the account Debtor had opened in Defendant, First American's, bank. Said checks were ultimately dishonored by the Defendant for insufficient funds.

■ 11. Under Florida Law, "a payor bank is liable to its customers for damages proximately caused by the wrongful dishonor of an item." Fla.Stat. § 674.4–402.

12. Defendant bank dishonored checks drawn by Plaintiff's Debtor because it unjustifiably failed to timely provide and fund the revolving line of credit which it had agreed to do.

13. Dishonoring of checks issued by the Debtor directly caused a loss of income which inescapably resulted in involuntary bankruptcy, and monetary loss to Plaintiff's Debtor in the amount of $349,000.00.

■ 14. Additionally, under Florida Law, any alteration of an instrument is material which changes the contract of any party thereto in any respect, including but not limited to the writing as signed by adding to it. Fla.Stat. § 673.407 (1985). While the Court is authorized to discharge the loan and promissory note under § 673.407; *Peacock v. Farmers and Merchants Bank*, 454 So.2d 730 (1st DCA 1984); to do so would be inequitable in the instant case. Rather, the Court finds that the instrument should be enforced according to its original provisions as set forth by the original oral Banking Agreement and spelled out in the letter dated October 29, 1985.

15. A Final Judgment in accordance with these findings and conclusions will be entered separately by the Court.

## FINAL JUDGMENT

In conformity with the Findings of Fact and Conclusions of Law of even date, it is

ORDERED

Defendant, First American Bank and Trust, shall pay the Plaintiff's Debtor's damages in the amount of $349,000.00. Additionally, the Court declines to void the Debtor's $150,000.00 obligation to the Defendant. To that extent, the original oral Banking Agreement as set forth in the letter dated October 26, 1985 shall be enforced and the Promisory Note dated January 8, 1986 shall not be enforced.

DONE and ORDERED.